United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 6, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 04-40967

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MANUEL SANTIAGO AMADOR-VELASCO,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas
5:04-CR-102-ALL

Before GARWOOD, BARKSDALE, and GARZA, Circuit Judges.

PER CURIAM:[*]

Defendant-appellant Manuel Santiago Amador-Velasco (Amador) was convicted, following the jury's April 15, 2004 verdict of guilty, of one count of conspiracy to possess with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, and one count of aiding and abetting the possession with intent to distribute more than five kilograms of cocaine in violation of 18 U.S.C.§ 2, 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). He was sentenced July 15,

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

2004 to concurrent terms of 151 months' confinement and five years' supervised release on each count. Amador appeals his convictions on the grounds that the evidence is insufficient and that his expert witness was improperly excluded. He also appeals his sentence, arguing that the district court committed *Booker* error by sentencing him under a mandatory Guidelines regime. We affirm.

I.

Amador, a forty-five-year-old used-car dealer from Monterrey, Mexico, was stopped at 5:30 p.m. on December 26, 2003, at the United States Border Patrol checkpoint facility located fifteen miles north of Laredo, Texas on IH-35. Amador was the driver and sole occupant of his 2002 Chevrolet station wagon. Border Patrol Agent Jaime Vega questioned Amador regarding his immigration status and citizenship, to which Amador replied he was not a United States citizen and was on his way from his home in Monterrey, Mexico to shop in San Antonio. Agent Vega testified he became suspicious because Amador refused to make eye contact with him and tightly gripped his steering wheel.

As Agent Vega continued to question Amador, Border Patrol Agent Luis Uribe escorted his drug detection canine, Tessa, around Amador's vehicle. Tessa alerted to the car, and Amador was consequently directed to the secondary inspection site. At the secondary inspection site, Amador remained outside his car

with Agent Vega while Agent Uribe walked Tessa around the car a second time and Tessa alerted again to the underbody of the vehicle. Agent Uribe then raised the car on a lift for further inspection and ultimately found a false compartment under the vehicle where the spare tire was located. During this time, Agent Vega notes that Amador was acting "fidgety" and otherwise impatiently.

Easily opening the trap door to the false compartment by knocking off the Bondo holding it in place, Agent Uribe found bundles of cocaine weighing 18.82[1] kilograms in total (estimated value: $ 1.4 million). Agent Uribe opined that the trap-door compartment was constructed in such a way to allow for repeated use. When shown the contraband, Amador appeared "calm," did not act "shocked," and denied knowledge of the bundles of cocaine. At this point, DEA Agent Clint Hardcastle arrived at the checkpoint, took control of the drugs, and read Amador his rights. Agents found no luggage or clothing indicating a planned stay in the United States. A Mexico-issued car registration and bill of sale dated August 9, 2003, confirmed that Amador owned the vehicle.

Amador does not contest that the vehicle was his but claims his possession was not exclusive due to the complex circumstances

---

[1]Both the government and the defendant stipulated at trial that the "net weight of the cocaine involved [was] 18.82 kilograms, or approximately 41.5 pounds."

surrounding his procurement of it. He claims that while driving one day in Monclova, Coahuila, Mexico (two-and-a-half hours from his home in Monterrey), he happened to encounter the station wagon in question on the street with a "for sale" sign.[2] He pulled over and spoke to two strangers, Victor Manuel Echavarria-Gomez (Echavarria) and Roberto Becera (Becera), about purchasing the vehicle. The vehicle was selling for 97,000 pesos but Amador resisted, claiming he only had 50,000 pesos on hand. Becera ultimately agreed to accept half of the negotiated price of 88,000 pesos if Amador agreed to work for him to pay off the remaining balance of 44,000 pesos.

According to Amador, Becera offered to pay him 30,000 pesos (approximately $3,000.00) per month if he would illegally transport American dollars from the United States to Mexico to avoid the reporting requirements. Becera acknowledged the false compartment in the car used for this purpose, referring to it as a "safe." Amador accepted the terms of the deal. At this point, on August 9, 2003, Amador took possession of the vehicle, obtaining a temporary permit until the registration was placed in his name.

Amador testified that Becera took possession of the car at the beginning of November 2003, ostensibly to get documentation

---

[2]Amador testified that he traveled to Monclova to buy cars to sell in his ten-year-old used-car business about ten times a year "because they were cheaper there than in Monterrey."

to change the license plates on the vehicle, and returned it to Amador December 7 or 8, 2003. Amador subsequently received (and followed) Becera's instructions on December 25, 2003, via messenger, directing Amador to travel to Laredo, Texas on December 26, 2003. Amador did so, leaving the vehicle at the Mall Del Norte in Laredo at 4:00 p.m. on December 26, ostensibly to be loaded with currency for the return trip to Mexico. When Amador returned approximately an hour later, he encountered Becera who instructed him on a change of plans, directing him to go to San Antonio to have the false compartment loaded with currency. Amador then began to drive toward San Antonio until he was intercepted at the checkpoint just outside Laredo where he was subsequently arrested.

## II.

### A.

Amador first argues that the evidence is insufficient to establish his knowledge of the contents of his vehicle's hidden compartment. He claims he never made any inconsistent statements, has always denied knowledge of the drugs, has no criminal record, and had no other items in his possession that would arouse suspicion. Further, he argues that his possession of the vehicle was not continuous throughout his ownership of it and that the car was previously searched (without incident) with use of a drug-sniffing dog when he crossed the border from Mexico

5

into Laredo, Texas.  He then claims that unknown to him someone placed the drugs in the hidden compartment after he crossed into the U.S.

We review the evidence *de novo* in the light most favorable to the verdict, but will uphold the verdict only if there is substantial evidence from which a rational trier of fact would find beyond a reasonable doubt all the essential elements of the offense charged.  *United States v. Alarcon*, 261 F.3d 416, 422–23 (5th Cir. 2001); *United States v. Moreno*, 185 F.3d 465, 471 (5th Cir. 1999).  The jury is free to choose among the various reasonable constructions of the evidence and the evidence does not have to exclude all hypotheses of innocence.  *Moreno*, 185 F.3d at 471.  Yet, "[i]f the evidence tends to give 'equal or nearly equal circumstantial support' to guilt or innocence, however, reversal is required: When the evidence is essentially in balance, 'a reasonable jury must necessarily entertain a reasonable doubt.'" *United States v. Ortega Reyna*, 148 F.3d 540, 543 (5th Cir. 1998) (quoting *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996)).

To convict Amador of possessing cocaine with intent to distribute, the government had to prove beyond a reasonable doubt that Amador (1) knowingly (2) possessed cocaine (2) with intent to distribute.  *Moreno*, 185 F.3d at 471; 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846.  To establish aiding and abetting the

6

criminal venture of possession with intent to distribute cocaine, the government had to prove "that [Amador] (1) associated with the criminal enterprise; (2) participated in the venture; [and] (3) sought by his action to make the venture succeed." *United States v. Valdez*, 453 F.3d 252, 260 (5th Cir. 2006); 18 U.S.C § 2; 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Amador only challenges the knowledge requirement.

A jury may infer knowledge if the defendant was in control of the drug-containing vehicle but proof of the defendant's knowledge generally depends on inference and additional circumstantial evidence where the drugs are hidden in a secret compartment. *Moreno*, 185 F.3d at 471; *Ortega Reyna*, 148 F.3d at 544. We require this level of proof in hidden compartment cases because there "is at least a fair assumption" that the defendant may have been used as an unwitting carrier or mule in the drug smuggling enterprise. *United States v. Diaz-Carreon*, 915 F.2d 951, 954 (5th Cir. 1990). We have previously recognized as circumstantial evidence of guilty knowledge: (1) nervousness; (2) absence of nervousness or a calm, collected demeanor; (3) refusal to make or retain eye contact; (4) reluctance to answer questions; (5) lack of surprise when the illegal drugs are found; (6) statements that are inconsistent; (7) explanations that are implausible; (8) possession of a large amount of cash; (9) obvious or significantly noticeable changes to the vehicle,

particularly when the defendant has had possession of the vehicle for a significant period of time. *Ortega Reyna*, 148 F.3d at 544.

There is sufficient evidence in the record by which a rational jury could find Amador guilty under our recent precedent. In *Moreno*, this court held that evidence exposing the defendant's "inconsistent statements and implausible explanations" were sufficient to "lead a reasonable trier of fact to doubt [the defendant's] credibility." 185 F.3d at 472. In *Resio-Trejo*, another hidden-compartment drug case, the defendant exhibited no signs of nervousness during the search of his vehicle, like Amador, but this court stressed the defendant's well-documented, continuous ownership and inspection regimen to find the additional circumstantial evidence needed to sustain his convictions. 45 F.3d at 912. Long, exclusive control and ownership may not be necessary under *Resio-Trejo*. To support our finding in *Resio-Trejo*, we cited a case where the evidence was sufficient when the defendant possessed the vehicle in question for a mere week prior to the search. 45 F.3d at 912 (citing *United States v. Olivier–Becerrill*, 861 F.2d 424, 427 (5th Cir. 1988)). It is uncontested that Amador possessed the vehicle in question for well over four months prior to his arrest, though Amador claims there was a brief period where Becera had possession approximately three weeks prior to Amador's arrest.

The jury would not be unreasonable in choosing to disregard

8

Amador's story about his acquisition of the vehicle as not entirely credible. Amador's odd behavior when he was stopped at the checkpoint may also provide at least marginal support for the jury's findings, including his lack of surprise when the cocaine was discovered in his car. Further, the false compartment was sealed with Bondo, an auto-repair putty, which when Agent Uribe knocked it off with a hammer had dried to a level Agent Uribe estimated at "several days old" but not months old, suggesting the cocaine had been placed in the car prior to Amador's border crossing but well after Becera no longer had possession of the car. And, the jury could have considered that the monetary value of the drugs found in the vehicle, $ 1.4 million, made it unlikely for Amador to have been an innocent, misled mule. *See United States v. Villarreal*, 324 F.3d 319, 324 (5th Cir. 2003); *United States v. Gamez-Gonzales*, 319 F.3d 695, 699 (5th Cir. 2003).

Crucially (and unlike any of the hidden compartment cases he relies on), Amador freely admitted he knew about the hidden compartment at the time he bought the car from two strangers in an area of Mexico remote from his home at a reduced price in exchange for his use of the compartment to furnish illegal smuggling services. His explanation that he thought the compartment was to be used to facilitate a different smuggling purpose (money instead of drugs) could have been rejected by a

9

rational jury.  Also, a jury can consider "as circumstantial proof of guilty knowledge" a "charade of ignorance," as could be present in driving a car with a hidden compartment for illegal purposes without checking the compartment.  *Moreno*, 185 F.3d at 476.  Amador's claims he could not have checked the compartment could be disregarded by the jury (particularly since Agent Uribe testified he accessed the contents of the hidden compartment in a matter of minutes).

We hold that the jury's verdict was adequately supported by the evidence presented at trial.

## B.

Amador next claims that the district court abused its discretion by not admitting testimony from his proffered expert witness, Julio Garcia, a defense attorney from Laredo, Texas, who had served some eight years as state district attorney in the area during the 1980s.  Garcia was to testify that drug smugglers often lie to their carriers to prevent theft and conceal the value of the drugs.  The testimony was excluded under Rules of Evidence 702 and 704(b) due to a lack of a sufficiently reliable basis for Garcia's testimony and because the proposed testimony regarded Amador's mental state, an ultimate issue for the jury.

We review the district court's decision to admit or exclude evidence for abuse of discretion.  *United States v. Dixon*, 413 F.3d 520, 523 (5th Cir. 2005); *United States v. Gutierrez-Farias*,

10

294 F.3d 657, 662 (5th Cir. 2002).  "Expert testimony is admissible if (1) it will assist the trier of fact to understand the evidence or to determine a fact in issue; (2) it is based on sufficient facts or data; (3) it is the product of reliable principles and methods; and (4) the witness has applied the principles and methods reliably to the facts of the case." *Dixon*, 413 F.3d at 523 (citing FED. R. EVID. 702).  Rule 704(b) prohibits expert opinions as to whether a defendant did or did not have the mental state constituting an element of the offense.

The district court held a *Daubert* hearing outside the presence of the jury to determine the admissibility of Garcia's testimony.  Garcia testified that, after discussions with investigating officers, witnesses and defendants-clients, he had come to the opinion that "owners of drugs lie to the drivers of their 'merchandise' to prevent theft, and conceal the type of contraband being transported to prevent knowledge of the value of the contraband."  Garcia admitted, however, that his information was obtained second- or third-hand, that he had no personal knowledge as to the facts on which he based his opinion, and that he never corroborated or verified any of his information.  The district court excluded Garcia's testimony because it: (1) questioned the reliability of the information upon which attorney Garcia premised his opinion, per Rule 702; and (2) concluded that attorney Garcia's testimony was proffered for the purpose of

11

addressing the ultimate issue in the case in violation of Rule 704(b).

We have held that a court's decision to disallow testimony similar to that offered by Garcia was not in error and that allowed testimony similar to that offered by Garcia was in error. *See United States v. Gutierrez-Farias*, 294 F.3d 657, 663 & n5 (5th Cir. 2002); *United States v. Mendoza-Medina*, 346 F.3d 121, 129 (5th Cir. 2003).

In the present case, the district court acted well within its discretion in excluding Garcia's proffered testimony under either Rule 702 or Rule 704(b). There appears to be a very tenuous factual basis for his testimony. Also, like numerous other cases we have decided, it would not be an abuse of discretion to find that Garcia's proffered testimony skirts too close to the ultimate issue in this case—Amador's mental state.

### III.

Amador argues for the first time on appeal that he was sentenced in violation of *United States v. Booker*, 125 S.Ct. 738 (2005), contending the sentencing judge, visiting Chief District Judge Berrigan of the Eastern District of Louisiana (who did not preside at trial), made her sentencing decision under the misconception that the Guidelines were mandatory, rather than

12

merely advisory.[3]  Amador's presentence report established a base level of 34 with a guideline range of 151 to 188 months (the statutory range was 120 months to life pursuant to 21 U.S.C. § 841(b)(1)(A)).  There were no objections to the presentence report (and none are pursued on appeal), and Judge Berrigan sentenced Amador to the lowest sentence within the range: concurrent terms of 151 months on each count.

Since Amador did not raise any objections below to the sentencing, our review is for plain error. FED. R. CRIM. P. 52(b); *United States v. Mares*, 402 F.3d 511, 520 (5th Cir. 2005).  For there to be plain error, there must be "(1) 'error', (2) that is 'plain', and (3) that 'affect[s] substantial rights'." *United States v. Cotton*, 122 S.Ct. 1781, 1785 (2002).  In order for an error to affect a defendant's substantial rights, the error "must have affected the outcome of the district court proceedings,"

---

[3]The error Amador alleges is more correctly characterized as *Fanfan* error.  As clarified in the recent opinion *United States v. Rodriguez-Mesa*, 443 F.3d 397, 404 (5th Cir. 2006), *Booker* addresses two types of error:
> "'*Booker* error is found where the district court applied the mandatory Guidelines and enhanced a defendant's sentence on the basis of facts neither admitted by him nor found by a jury beyond a reasonable doubt, in violation of the Sixth Amendment[,]' whereas '*Fanfan* error is found where the district court applied the mandatory Guidelines to enhance a defendant's sentence absent any Sixth Amendment *Booker* error.'" (remanding for resentencing under harmless error review and quoting *United States v. Walters*, 418 F.3d 461, 463 (5th Cir. 2005) (remanding for resentencing under harmless error standard of review)).

13

*United States v. Olano*, 113 S.Ct. 1770, 1778 (1993), and the defendant must demonstrate a probability thereof "sufficient to undermine confidence in the outcome." *United States v. Dominguez Benitez*, 124 S.Ct. 2333, 2340 (2004). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Cotton*, 122 S.Ct. at 1785.

Sentencing under mandatory application of the Guidelines is plain error, thereby satisfying the first two prongs, so Amador must show that this error affected his substantial rights by "evidence in the record suggesting that the district court would have imposed a lesser sentence under an advisory guidelines system." *United States v. Taylor*, 409 F.3d 675, 677 (5th Cir. 2005); *United States v. Valenzuela-Quevedo*, 407 F.3d 728, 733 (5th Cir. 2005). A court's "imposition of a sentence at the bottom of the guidelines range, alone, does not indicate that there is a reasonable probability that the court would have imposed a lesser sentence under advisory sentencing guidelines." *United States v. Duarte-Juarez*, 441 F.3d 336, 339 (5th Cir. 2006). "However, a minimum sentence is 'highly probative, when taken together with relevant statements by the sentencing judge indicating disagreement with the sentence imposed, that the *Booker* error did affect the defendant's substantial rights.'"

14

*Id.; see also Mares*, 402 F.3d at 521.

The sentencing hearing was quite brief. After ascertaining that there were no objections to the PSR, the district judge adopted the PSR and its 151-188 months guideline range. The government announced it had no comment, and defense counsel merely stated:

> "MR. PENA, SR: The only thing that we are asking, Judge is that you consider the low end of this case which is bad enough in itself. It's 151 months.
>
> THE COURT: I agree with you."

The court then asked defendant if he wished to say anything and Amador made a short statement which, as defense counsel then briefly explained to the court, was essentially a vague and oblique reiteration of his trial defense that he didn't know cocaine was in the compartment. The following then transpired:

> "Okay. I will state for the record that I do agree with the implication of defense counsel that the guidelines are bad enough as it is, and I hope that some day the guidelines with respect to drug offenses in particular will be more reasonable and more compassionate to all the circumstances involved.
>
> All right. Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant . . . is hereby committed . . . for a total term of 151 months."

The government argues that the court's remarks are not sufficient to show that the judge would have reached a different conclusion under an advisory scheme, also noting that Amador has not offered any reasons or evidence that would justify a downward departure or variance from the Guidelines. Furthermore, Amador

15

did not object to the presentence report and never asked for a sentence below the Guideline range or offered any particular reason for leniency or a low sentence in his case.  He asked for 151 months, and that is what he got.

Amador has not succeeded in meeting his heavy burden under plain error review—he must show more under our precedent to convince this court that the sentencing judge would likely have sentenced him to a lower sentence, below the Guidelines range, but for the judge's (assumed) misconception that the Guidelines were mandatory.[4]

For example, in *United States v. Pennell*, 409 F.3d 240, 245 (5th Cir. 2005), the defendant met his burden where sentencing court stated:

> "Once again, I say that from many standpoints of fairness and justice, it might be better to sentence people just based on actual loss, but I don't think that's the way the guidelines are written or the appellate courts interpreted them in most cases. So I feel constrained to overrule your objection."

In *United States v. Garcia*, 416 F.3d 440, 441 (5th Cir. 2005), this burden was met where the court in the sentencing hearing "discussed at length the difficulties of long prison sentences and their effect on families," and, noting that the defendant was a married father of small children, then "opined: 'You [Garcia] are a young man and *I would prefer to sentence you to a lesser*

---

[4]The district court never referred to the guidelines as being mandatory or inflexible or the like, although we assume that the court regarded them as mandatory in the *Booker* sense.

16

*sentence than required under the guidelines* but I'm going to follow the law and assess punishment appropriately based on the circumstances that are presented before me.'" *Id.* (emphasis added). The *Garcia* court then sentenced the defendant to the lowest sentence in the applicable Guidelines range. *Id.*

Likewise, in *United States v. Montes–Nunez*, 2005 WL 3099635 (5th Cir. Nov. 21, 2005) (unpublished), this court found reversible *Fanfan* error under plain error review where the minimum guideline sentence was imposed and the sentencing judge repeatedly stated that the range was excessive and that *the sentence imposed* was "an excessive sentence any way you cut it."[5]

---

[5]The judge's statements in *United States v. Montes-Nunez* are as follows:

"[Defense Attorney]: ... [The defendant] didn't come over here with a machine gun. He wasn't robbing. He wasn't killing. [The sentence is excessive.]

The Court: I understand . . . I understand what you are saying.

[Defense Attorney]: He just crossed the political boundary.

The Court: I understand. But the problem is that Congress has said that crossing the political boundary when you are a convicted criminal alien is going to be a serious offense.

[Defense Attorney]: I understand that, Your Honor. But this Court also has certainly the power and also is in a position to do justice here. And to make the sentence fit the gravity of the crime.

The Court: I am not going to do it by perverting the guidelines because the sentence is very high for coming over illegally. I agree with you. *This is an excessive*

17

This court has also cited the Eleventh Circuit's *United States v. Shelton,* 400 F.3d 1325 (11th Cir. 2005).[6]  In *Shelton*, the

*sentence any way you cut it. However, it is not within my power to ignore the guidelines* or the law just because I don't agree with the guideline ranges.

[Defense Attorney]: Well, I do agree that the sentence range here would be excessive. And I am basically presenting a technical argument to the Court that ameliorates the severe effect of the sentencing range and-

The Court: I understand . . .

[Defense Attorney]: I think there is a good argument that can be made that the guidelines could be applied in that way.

The Court: But I would—what I would be doing is, I would be misapplying the guidelines. And that's what gives rise to the Protect [sic] and the Patriot Act. This is a misapplication of the guidelines to these laws. That's what is making Congress very angry about the courts. And that's why they are tightening it up. I would suggest, make this argument to Congress, see if they will change the laws. And I would support you in your request in terms of Congress. However, I am not going to misapply the guidelines and get around the intent of Congress because I don't agree with the sentencing range. And I think that they are personally excessive. I agree with you. They are excessive." *Id.* (emphasis added).


[6]In *Bringier*, however, this court distinguished *Shelton*: "Unlike *Shelton*, the sentencing judge here did not lament over the sentence he imposed, nor did he state that the sentence is '*more* than appropriate' or '*too* severe.' Instead, he merely acknowledged the sentence was harsh. In addition, the fact that the sentencing judge imposed the minimum sentence under the Guideline range (360 months) alone is no indication that the judge would have reached a different conclusion under an advisory scheme." *United States v. Bringier*, 405 F.3d 310, 318 n.4 (5th Cir. 2005)

18

Eleventh Circuit vacated and remanded for resentencing under plain error review where the defendant pointed to statements in the record which, when taken together, indicated that the sentencing court would have sentenced him to a lower sentence under an advisory regime as opposed to the presumed mandatory regime. The sentencing court commented that *Shelton's sentence* was "very, very severe" due to his criminal history points and the mandatory consecutive sentence for the section 924(c) firearms count. *Id.* at 1328. It also noted that "unfortunately" the Guidelines criminal-history calculation takes into account each of the defendant's past charges and not the fact that the sentences imposed on those charges were short as a result of such factors as the youth of the defendant or amount of drugs involved. *Id.* It also expressed its disapproval of the severity of the sentence by stating that Congress has taken a "very, very hard stance when it comes to guns and drugs." *Id.* Finally, the sentencing court indicated that the most lenient sentence it could impose, a sentence at the low end of the Guidelines range, was "*more than* [was] *appropriate in this situation.*" *Id*. (emphasis added).

Here, the district court's comments simply do not rise to the level present in the above cases but rather are more similar to those in which we have not found plain error. The defendant in *United States v. Bringier*, 405 F.3d 310 (5th Cir. 2005),

19

failed to satisfy his burden to prove his substantial rights were affected.  In *Bringier*, the sentencing court merely noted, similar to the present case, that the sentence imposed was harsh:

> "I do not know that the testimony at the trial ever made it, nailed it down, but I suspect-and I think you probably suspect as well-that your activities led to the death of your wife and child. I just think it is, you know, a tragedy, you know, a waste of a young man that could have been many things.
>
> I do not know what to tell you other than this is the—even though it is a harsh sentence of 30 years, that is the lowest sentence that I could give you. Your convictions on these counts could have carried a life sentence, but I do not see any reason to sentence you beyond the minimum." *Id.* at 317 n.4.

In *United States v. Mendoza-Sanchez*, 456 F.3d 479 (5th Cir. 2006), the defendant failed to show that the sentencing court's plain *Fanfan* error affected his substantial rights.  In *Mendoza-Sanchez*, the district court sentenced the defendant to the lowest end of the Guidelines range but we noted that "the fact that the sentencing judge imposed the minimum sentence under the sentencing Guidelines range, alone, is no indication that the judge would have reached a different conclusion under an advisory scheme." *Id.* at 484.  *See also, e.g., United States v. Rodriguez-Gutierrez*, 428 F.3d 201, 204-06 (5th Cir. 2005); *United States v. Duarte-Juarez*, 441 F.3d 336, 339-40 (5th Cir. 2006).[7]

---

[7]Additionally noteworthy is our opinion in *United States v. Pineiro*, 410 F.3d 282 (5th Cir. 2005), where the defendant preserved his objection thereby causing his *Fanfan* claim to be reviewed for harmless error—placing the burden on the government to show that the sentencing judge would not have imposed a

The district court's statements here skirt very close to the line but nevertheless fall on the side of affirmance as, in the context of the overall sentencing proceeding, they lack the specificity needed for Amador to satisfy his heavy burden to mandate plain error reversal. For example, unlike in *Garcia*, where the judge explicitly said "I would prefer to sentence you to a lesser sentence than required under the guidelines," 416 F.3d at 441, the district court here only deplores the state of

different sentence under an advisory regime. We vacated the sentence and remanded for resentencing under the harmless error standard, holding that a judge's silence as to whether he would have imposed a different sentence under an advisory regime does not satisfy the government's burden, but stated, specifically, that the sentencing judge's remarks would likely not warrant remand under plain error review. Noting that the sentencing judge never said the range was too high in light of the offense or that he would rather impose a lower sentence, we found the following statements by the sentencing judge sufficient for remand under harmless error review but insufficient for remand under plain error review:

> "Mr. Pineiro, you do understand, and I'm sure your attorney has told you, that the Court in meting out sentencing, this and virtually every other case that comes before the Court, I'm bound by sentencing guidelines [that are] prepared by the US Sentencing Commission. So I have to operate within those [parameters], unless there are certain reasons why the guidelines can be bent[. F]or example, with substantial cooperation, the government can file a motion for a downward departure based on substantial assistance by a defendant, and the Court can depart. In that regard, the Court can also depart upward in certain cases where there are . . . aggravating circumstances not fully taken under consideration by the guidelines. I don't know of [any] reason in this case why either—there should be either an upward or a downward departure from the guidelines. So to that extent, the Court will adhere to the guidelines." *Id*. at 286 n.6.

21

guideline drug sentences in a wholly general way—there does not appear to be anything in her statements affirmatively indicating that she likely would have reached a different sentence in this particular case under an advisory scheme.  Rather, at the most the minimum sentence is merely "bad enough" not *too* bad (or, her agreement may simply be with 151 months as an appropriate sentence). Amador must show something more specific or concrete for plain error—not merely general hypotheses of a sentencing judge's possible inclination but an adequate indication she would actually have preferred to sentence this particular defendant for these particular offenses below the applicable Guidelines range. *See Mares*, 402 F.3d at 521–22.  Amador's case does not amount to an error worthy of remand under the high burden presented by plain-error review.

## IV.

For the foregoing reasons, the defendant's convictions and sentence are

AFFIRMED.